RENDERED: AUGUST 26, 2010
TO BE PUBLISHED

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$

FINAL

2008-SC-000894-DG

DATE _____

COMMONWEALTH OF KENTUCKY                                          APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                  CASE NO. 2007-CA-002518-MR
FAYETTE CIRCUIT COURT NO. 07-CR-00242

NABRYAN MARSHALL                                                  APPELLEE

**OPINION OF THE COURT BY JUSTICE SCOTT**

**REVERSING**

After entering a conditional guilty plea, Appellee, Nabryan Marshall, was convicted of trafficking in a controlled substance and bail jumping in Fayette Circuit Court on October 15, 2007. Appellee's plea bargain reserved his right to appeal the trial court's order overruling his earlier motion to suppress evidence that he alleges was collected in violation of the Fourth Amendment of the United States Constitution and Section Ten of the Kentucky Constitution. On direct appeal, Appellee successfully argued that the search was unconstitutional, and the Kentucky Court of Appeals reversed the trial court's order. The Commonwealth, Appellant, then petitioned this Court for discretionary review, asking us to reverse the Court of Appeals' determination that (1) a search more invasive than a *Terry* frisk was not constitutionally

permitted, and (2) the strip search in this case was conducted unreasonably. We granted that petition, and now reverse the Court of Appeals on both issues.

## I. Background

On January 2, 2007, Appellee was spotted by Officer Schwartz of the Lexington Metro Police Department. After securing backup, Schwartz decided to engage him, being under the impression that Appellee had an outstanding warrant. As explained below, the officer eventually made contact with Appellee in a nearby apartment unit, where, on location, he conducted a strip search of Appellee's groin area. That strip search is the seminal event to this appeal. Due to the factually intensive nature of our analysis below, we reserve further recitation of the relevant facts at this juncture.

## II. Analysis

### A. *Terry* Frisk and Subsequent Search

We first address the Commonwealth's contention that the Court of Appeals erred by concluding that a search more invasive than a *Terry* frisk was not merited in this case.

Both the Fourth Amendment to the United States Constitution and Section Ten of the Kentucky Constitution guarantee "[t]he right of the people to be secure in their person, house, papers and effects, against unreasonable searches and seizures." Ordinarily, under both Constitutions, a search or seizure may not be had by the government unless a detached magistrate finds probable cause and issues a warrant. *Helton v. Commonwealth*, 299 S.W.3d

2

555, 560-61 (Ky. 2009). Obtaining that warrant makes the search or seizure constitutionally permissible, absent other defects.

Yet, there are limited exceptions where the government is not required to seek the permission of a detached magistrate before searching or seizing a person. In particular, an officer may arrest an individual without a warrant where he has probable cause to believe that the person has committed a felony. KRS 431.005(1)(c).[1] Additionally, where an arrest warrant has been issued for a suspect, that warrant will provide the arresting officer with all the valid probable cause needed to arrest that individual—and the officer will need nothing more. KRS 431.005(1)(a).

Searches are governed in nearly the same fashion as seizures. But, like the rule governing seizures, there are also exceptions, one being a search incident to arrest. *United States v. Robinson*, 414 U.S. 218 (1973); *Gustafson v. Florida*, 414 U.S. 260 (1973). Under this exception, an officer may make a warrantless search of an arrested individual, the justification being the need to disarm the suspect and, *equally important*, the need to preserve evidence for later use at trial. *Robinson*, 414 U.S. at 234 (*citing Agnello v. United States*, 269 U.S. 20 (1925); *Abel v. United States*, 362 U.S. 217 (1960)).

And, there are circumstances when an officer may make a limited seizure and a limited search without either a warrant or probable cause. In *Terry v. Ohio*, the United States Supreme Court carved out this exception to the

---

[1] An officer may also arrest an individual for a misdemeanor where that misdemeanor is committed in the officer's presence. KRS 431.005(1)(d).

probable cause requirement, permitting brief investigatory stops in circumstances where police officers have a reasonable suspicion that "criminal activity may be afoot." 392 U.S. 1, 30 (1968). So long as the officer can articulate facts giving rise to his suspicion of criminal activity, and where his suspicions are reasonable under the circumstances, a brief stop of a suspect is constitutionally condoned. *Id.* Moreover, once the officer makes a lawful *Terry* stop, she may then "frisk" that individual where she is of a reasonable belief that the suspect is armed and presently dangerous. *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979) (*citing Adams v. Williams*, 407 U.S. 143, 146 (1972)); *Terry*, 392 U.S. at 21-24. During these *Terry* frisks, an officer may seize any contraband he finds, so long as the illegal nature of the contraband is immediately apparent to the plain feel of his hand. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

These brief *Terry* frisks often mature into full-blown probable-cause-based searches, particularly when an officer, while conducting a pat down, becomes immediately aware of contraband, and does so without manipulation of the object felt, but with the simple plain feeling of his hand. *Dickerson*, 508 U.S. at 376. In other words, under the "plain feel" doctrine the object must be immediately identifiable as a weapon or contraband by a simple "pat down" before it may be legally seized. *Id.* Once recognized as a weapon or contraband, an officer may perform a more invasive search such as entering the pockets of the suspect or even placing his hands down a suspect's pants, wherever the

immediately apparent contraband may be. *See Murrell v. Commonwealth*, No. 2003-CA-000436-MR, 2004 WL 1175782 (Ky. App. May 28, 2004) (it is constitutional for a police officer to place his hands inside an arrestee's pants and underwear to retrieve what he knows, upon plain feel and without manipulation, to be contraband). Moreover, once an illegal substance is identified on the suspect, the reasonable suspicion required to detain the suspect ripens into probable cause and an arrest may be made meriting an even further probable-cause-based search of other areas. *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010).

However, when a defendant alleges that the government collected evidence from his person in a fashion violative of the above-discussed rules, a suppression hearing is warranted. RCr 9.78. At this hearing, a court must consider whether the warrantless search was conducted in a manner that does not trample the Fourth Amendment. Normally, that inquiry questions the existence of probable cause or reasonable suspicion, whatever the situation necessitates. And where the court determines that an officer conducted the search or seizure without the appropriate level of reasonable suspicion or probable cause, suppression of the discovered, incriminating evidence will be commanded. *United States v. Calandra*, 414 U.S. 338 (1974); *See also Young v. Commonwealth*, 313 S.W.2d 580 (1958).

When required, an appellate court in this Commonwealth will review a trial court's suppression decision pursuant to RCr 9.78, which provides in part

5

that, "[i]f supported by substantial evidence the factual findings of the trial court shall be conclusive." If upon review of the factual findings under a clearly erroneous standard, we conclude that the trial court's findings are supported by substantial evidence, we then undertake a de novo review of that court's application of the law to those facts. *Commonwealth v. Pride*, 302 S.W.3d 43, 49 (Ky. 2010).

With these guiding principles in mind, we turn to the case at bar, and judge the correctness of the Court of Appeals' determination that the search in this case exceeded that which is permitted by *Dickerson, supra,* and, further, its determination that any exploration beyond a *Terry* frisk was improper.

The Commonwealth asserts that the Court of Appeals erred when it determined that Officer Schwartz exceeded his authority to search Appellee's groin area and posits that the Court of Appeals did not provide the appropriate deference to the trial court's determination that the officer was immediately aware of the contraband in Appellee's underwear.

Appellee responds by arguing that a search beyond a *Terry* frisk was not constitutionally permissible and was illegal under the facts in this case. As a result, Appellee contends that the Court of Appeals was correct in reversing the trial court's contrary determination.

Having considered the circumstances of the search, the trial court's findings, and the parties' arguments, we hold that a search more invasive than

a *Terry* frisk was appropriate in this case and therefore reverse the Court of Appeals' determination that the search exceeded constitutional limits.

Here, Schwartz testified that: (1) after spotting Appellee in an area known for criminal activity; (2) being informed that Appellee was actively selling narcotics; (3) knowing from prior contact that Appellee was usually armed; and (4) because of his knowledge that there was an "unconfirmed warrant" for Appellee's arrest, he decided to wait for backup and then "make contact" with Appellee.[2] By the time backup arrived, Schwartz had lost sight of Appellee, so the officers then began to search the area.

During their search, the officers encountered a frantic witness who informed them that Appellee was involved in a fracas inside a nearby apartment unit. As the officers approached the complex, Schwartz witnessed two women climbing out of the back window of the suspect apartment unit. The women stated that there was an altercation going on in the apartment and that they wanted to escape the situation. Schwartz and the other officers then proceeded to enter the apartment and could hear the confrontation upon arrival. As they proceeded through the apartment, Schwartz testified that he spotted Appellee toward the back of one of the rooms with his back-side partially turned toward Schwartz and with both hands down the front portion of his pants. All the while, another individual was yelling from inside the

---

[2] The trial court directly questioned Schwartz about the definition of an "unconfirmed warrant." He testified that an "unconfirmed warrant" is a warrant that the officer is aware of, but is unsure of whether it has been served or is still outstanding. He testified that a warrant is only confirmed by either the district court or the sheriff's office.

apartment "It's in his crotch—it's in his crotch!" Schwartz, fearing that he had just witnessed Appellee conceal a weapon in his groin area, placed Appellee in hand cuffs and performed a *Terry* frisk.

On direct examination, Schwartz testified that while performing the *Terry* frisk he felt a hard, rock-like substance in Appellee's groin area, and, based on his five years' experience as a police officer, determined it "to be *possibly* crack cocaine." (emphasis added). In contrast, on cross-examination, Schwartz testified that upon feeling the golf ball sized object he *"knew it to be* crack cocaine based on all [his] experience with it." (emphasis added). After hearing Schwartz's testimony, the trial court found that the officer immediately knew the item was contraband upon contact, that Schwartz did not manipulate the object when making his determination, or that that there was insufficient evidence to show that the officer could have mistaken the object for a part of Appellee's anatomy. The court denied the motion to suppress.

The Court of Appeals reversed the trial court's order, concentrating on the officer's testimony that the object could "possibly" be crack cocaine. The Court of Appeals, also influenced by the fact that Schwartz had determined the absence of a weapon on Appellee when he decided to do a more invasive search, found that the object felt could have been numerous items other than contraband. Relying in part on our opinion in *Commonwealth v. Jones*, 217 S.W.3d 190 (Ky. 2006), the Court of Appeals determined that further exploration beyond a *Terry* pat down was improper. We disagree and therefore

reverse the Court of Appeals and reinstate the trial court's order denying Appellee's motion to suppress.

Because the parties do not contest whether there existed reasonable suspicion to stop or frisk Appellee in this case, we begin our analysis with the determination of whether a search more invasive than a *Terry* frisk (a strip search) was permissible.

Strip searches are not always appropriate and as noted above, even when "a person is validly arrested [or validly arrestable, that] does not mean that he is subject to any and all searches that the arresting officer may wish to conduct." *United States v. Mills*, 472 F.2d 1231, 1234 (D.C. Cir. 1972) (en banc).[3] This rule is specifically applicable to strip searches, as they are extremely invasive and in fact will sometimes be totally improper, repugnant, and illegal. *See Stewart v. Lubbock County*, 767 F.2d 153, 156-57 (5th Cir.1985) (strip searches conducted without reasonable suspicion that minor offenders had possession of contraband are unreasonable and violate the Fourth Amendment); *Taylor v. Commonwealth*, 507 S.E.2d 661, 663 (Va. App. 1998); *see also Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir.1983) (strip searches prohibited where minor offenders are not inherently dangerous, are not being committed to a jail population but are merely being briefly detained, and officers have no reason to believe they are hiding weapons or contraband). Searches may not be conducted on the "mere chance that

---

[3] Whether Appellee was arrested at the time this search was conducted is irrelevant. *See* footnote 9, *infra*.

desired evidence might be obtained." *Schmerber v. California,* 384 U.S. 757, 769-70 (1966)); s*ee also* LaFave & Israel, *Criminal Procedure* § 3.5(c), at 177 (2d ed. 1992) (routine strip searches cannot be "employed against all classes of arrestees"). But there are situations where strip searches are necessary and particularly so where the officer has probable cause to specifically search such a private area to preserve or prevent the destruction of evidence or to discover a concealed weapon. Such were the facts surrounding our holding in *Williams v. Commonwealth,* a decision based on events resembling those here. 147 S.W.3d 1 (Ky. 2004).

In *Williams,* the police conducted a strip search of the defendant on location in an apartment bathroom. *Id.* There, we addressed whether the strip search conducted was supported by probable cause. *Id.* In answering the question in the affirmative, we found that because the officers had reliable information that the defendant had hidden the contraband between his buttocks, and because the officers were reasonable in believing that the arrestee placed the evidence at risk of being lost, the search was supported by probable cause. *Id.* at 8.

Here, the officer had more knowledge than what the officers had known in *Williams.* Schwartz was told that Appellee was actively selling drugs and knew from his prior experience[4] that Appellee tended to carry a weapon. With this knowledge, and during his investigation of a fracas that produced three

---

[4] Schwartz had arrested Appellee on other occasions and testified that he had "quite a bit of prior contact" with him.

fleeing witnesses (two from a rear window of the same unit housing Appellee) Schwartz faced what one would reasonably believe to be a dangerous situation and suspect. What is more, during this investigation, Schwartz witnessed Appellee place both hands down the front of his trousers while another occupant of the apartment unit was yelling, "it's in his crotch!"

With this knowledge and while in a precarious environment, Schwartz placed Appellee in handcuffs and conducted a *Terry* frisk, later testifying that the frisk revealed a hard, rock-like substance he knew to be crack cocaine.[5] It was then that Schwartz decided to conduct a search more invasive than a *Terry* frisk. In a bedroom with the door partially opened, Schwartz and another officer faced the Appellee toward the wall and pulled down his pants and underwear. The officers then peered between Appellee's thighs, viewing Appellee's body from his back side. There, the two officers saw a plastic bag containing a white substance dangling from the front of Appellee's scrotum.

Schwartz had probable cause to conduct a search more invasive than a *Terry* frisk in this case because he knew what he felt was crack cocaine. By placing the crack cocaine in a location that makes the contraband immediately apparent to the plain feel of an officer's open hand, Appellee essentially

---

[5] We note that if taken alone and in a vacuum, the officer's testimony that he believed the rock-like substance "to be possibly crack cocaine" might have warranted suppression. However, Schwartz clarified his position when cross examined and unequivocally stated that when he felt the hard object secreted in Appellee's groin area, he knew it to be cocaine. Where there is a discrepancy in testimony, it is the trial court that should make the determination as to which portion of the inconsistent testimony to believe and that decision will not be disturbed on appeal absent a lack of substantial evidence to support that finding. *Pride*, 302 S.W.3d at 49.

positioned the contraband in what can be analogized as in "plain view" of the officers.[6] We find this search directly supported by *Dickerson* and *Williams, supra* and hold that that the reasonable search of an individual should not be held unconstitutional simply because the suspect chooses to hide contraband in a potentially embarrassing location and does so in a manner that makes the contraband immediately apparent to the plain feel of an officer's open hand.

In as much as the Court of Appeals was influenced by the handcuffing of Appellee and thus considered his inability to make contact with the contraband, we find such a consideration unnecessary. Upon immediately

---

[6] In *Dickerson,* the United States Supreme Court analogized the plain-view doctrine to searches where an officer becomes immediately aware of contraband by the plain feel of his hand. There, Justice White explained:

> We think that [the plain-view doctrine] has an obvious application by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search. The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment-or at least no search independent of the initial intrusion that gave the officers their vantage point. [citations omitted]. The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would do little to promote the objectives of the Fourth Amendment. [citations omitted]. The same can be said of tactile discoveries of contraband. If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

508 U.S. at 375-76.

identifying the contraband as crack cocaine, Schwartz's reasonable suspicion ripened into probable cause and he had the authority to arrest Appellee for any number of charges stemming from the possession of the crack cocaine, most of which are felonies. Based upon this probable cause alone, Schwartz was entitled to conduct a probable-cause-based search incident to arrest.[7] And when an officer has probable cause to conduct a warrantless arrest and search, we do not require the officer to make a determination regarding the probability of the arrestee's ability to destroy evidence on his person when performing a search incident to that arrest. *Collins v. Commonwealth*, 574 S.W.2d 296 (Ky. 1978) (citations omitted). We hold that as long as the arrestee is searched incident to an arrest, officers may retrieve any evidence or weapon on his person whether or not within his reach.[8] A contrary conclusion would lead to an unsound result as it would prohibit officers from removing evidence that

---

[7] Notwithstanding the Court of Appeals' concern with the timing of the search and the arrest we find the question of whether Appellee was under arrest at the time the search was conducted irrelevant. We need not make that determination to decide whether a probable-cause-based search was appropriate. In *Rawlings v. Kentucky*, the United States Supreme Court affirmed our judgment and ruled that "it is not particularly important that the search preceded the arrest" when the police had probable cause to arrest the defendant before the search and "the formal arrest followed quickly on the heels of the challenged search." 448 U.S. 98, 111 (1980). Here, the probable cause to arrest the defendant was supplied by the officer's realization that he harbored drugs on his person. Furthermore, the arrest immediately followed the search and thus we find *Rawlings* directly on point.

[8] We note that suspects harboring drugs on their person often attempt to discard them in the back of police cruisers after they have been arrested. *See Spears v. Commonwealth*, 78 S.W.3d 755 (Ky. App. 2002); *Prescott v. Commonwealth*, No. 2006-CA-000383-MR, 2007 WL 706848 (Ky. App. March 9, 2007); *Mitchell v. Commonwealth*, No. 2008-CA-000808-MR, 2004 WL 2150284 (Ky. App. Sept. 24, 2004).

they know to be on an arrestee's person simply because the arrestee cannot access the evidence due to his being in handcuffs or otherwise restrained. And because the preservation of evidence is as equally important as officer safety, such a rule would further lead to the absurd conclusion that an officer cannot remove a weapon if that arrestee is restrained and unable to access the weapon on his person. We repeat that neither the Constitution of Kentucky nor the Constitution of the United States requires an officer to weigh an arrestee's probability of success of obtaining a weapon or destructible evidence before searching a suspect incident to an arrest. *Id.* at 297 (citations omitted).

## B. Reasonableness of the Search

Having concluded that a search more invasive than a *Terry* frisk was indeed supported by probable cause, we now turn to the Court of Appeals' determination that the strip search conducted in this case so exceeded the bounds of propriety and reasonableness as to be unconstitutional.

The Commonwealth argues that the Court of Appeals should be reversed because the manner in which the strip search was conducted was reasonable under the circumstances. Specifically, the Commonwealth argues that because Appellee was not exposed to any undignified, humiliating, or terrifying touching or trauma, the search was conducted within constitutional bounds.

Appellee counters that the search was unreasonable because the contraband was not immediately apparent after a *Terry* pat down and thus the

14

officers exceeded their authority by pulling down his pants and underwear. Ultimately, Appellee asks this Court to recognize that because a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience, the search should have taken place at the police station and not in the apartment where Appellee was arrested. Moreover, Appellee argues that by conducting the search in a room with an open door, he was exposed to the apartment's other occupants, and thus subjected to an unconstitutional search.

There exists no brightline rule to determine how invasive a search may be when conducted without a search warrant, but we again recognize that simply because "a person is validly arrested does not mean that he is subject to any and all searches that the arresting officer may wish to conduct." *Mills*, 472 F.2d at 1234. Different circumstances will give rise to different searches and seizures, some searches and seizures being reasonable in one circumstance and not in others; but reasonableness under the circumstances is the cornerstone. Thus, a search may be supported by probable cause, but may be conducted in a manner making it so unreasonable as to require a finding of unconstitutionality. *See Schmerber*, 384 U.S. 757 (where the United States Supreme Court first analyzed whether the search was supported by probable cause and then determined whether the search (a blood test) was conducted in a reasonable manner); *see also Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007) (holding that strip search incident to arrest was not per se unreasonable

15

but holding that search was performed in an unreasonable manner when conducted in view of the public). In any event, we recognize that "[s]trip searches of detainees are constitutionally constrained by due process requirements of reasonableness under the circumstances." *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981), *cert. denied,* 455 U.S. 942, (1982); *Taylor,* 507 S.E.2d at 663.

### 1. *Bell* Factors

To make the determination of reasonableness, we consider the factors recommended by the United States Supreme Court in the case of *Bell v. Wolfish,* using them to balance the need for the particular search versus the personal rights that the search entails. 441 U.S. 520, 559 (1979). These factors include: (1) the scope of the particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating the search; and (4) the place in which it is conducted. *Id.*

After considering these factors and the specific circumstances surrounding this search, we conclude that the search was conducted in a reasonable manner.

### a. The Scope of the Particular Intrusion

The scope of the search in this case was broad. It involved the exposure of Appellee's buttocks and genital area and we agree that "regardless of how professionally, and courteously conducted, it is an embarrassing and humiliating experience by definition." *Hunter v. Auger,* 672 F.2d 668, 674 (8th

Cir. 1982). Outside of a physical examination, chemical examination, or cavity search, this type of search is the most invasive performed. Thus, we find that a more intensive analysis is necessary when searches of this nature are conducted, especially when done in the field. That is not to say, however, that these searches are per se prohibited—no court in this Commonwealth has ever made such a declaration, and we decline to do so today. But we do note that officers should be cautious when performing these types of searches, outside of a sanitary and secure police station. And while this case provides facts sufficient to support the reasonableness of the search conducted, that will not always be the case. Indeed, the police risk the loss of evidence when they subject arrestees to strip searches outside of the police station, and even sometimes when the search is conducted in the station house. *See Stewart*, 767 F.2d at 156-57 (holding strip searches conducted *in the station house* without reasonable suspicion that minor offenders had possession of contraband are unreasonable and violate the Fourth Amendment).

Here, as stated above, the officers faced a dangerous situation. With the knowledge that Appellee sometimes carried weapons and that an altercation was taking place, the officers proceeded through the confines of an apartment to investigate. Upon witnessing Appellee place something in his pubic area, and determining it to be contraband after performing a *Terry* frisk, the officer decided to visually search the external parts of Appellee's groin and buttocks. The officers did not probe into Appellee's body cavity and neither did they

manipulate any part of his anatomy. The scope of this search was confined to visually inspecting what the officer immediately knew to be contraband.

Thus, after fully weighing the facts surrounding this search, we conclude that its broad nature was necessary and was constitutionally in bounds.

### b. The Manner in Which the Search is Conducted

We find that the manner of the search and the appropriateness thereof should be controlled and determined by certain factors considered in *Schmerber*, 384 U.S. 757. There, the Court, after determining that probable cause supported the search, considered whether the search was reasonable and: (1) analyzed the type of search and its commonality (there, a blood test routinely used); (2) considered who performed the search (there, medical personnel); (3) weighed risk, pain and trauma to the arrestee (there, all of which were minimal); and (4) considered the skills required to conduct the search (there, medical practices controlled). *Id.* at 769. We thus consider these factors in the case at bar to determine whether the *manner* of the search conducted on Appellee was appropriate.

### i. Type of Search Performed, its Commonality, and by Whom

We first consider two of *Schmerber's* considerations in conglomeration—the type of search performed, its commonality and by whom—and conclude that they support a finding that the manner of this search was appropriate.

Here, trained officers conducted a search that is commonly performed on arrested individuals who officers already know hide drugs on their person.

Strip searches, especially of individuals who have hidden contraband in the manner Appellee did, are necessary to preserve evidence, to prevent infiltration of contraband into detainment centers and, sometimes, for officer's safety. Thus, we find them appropriate in some cases, particularly so here because the officer became immediately aware upon the plain feel of his hand that Appellee harbored drugs in a peculiar location on his person.

### ii. Existence of Risk, Pain, or Trauma

We next consider the existence of risk, pain, or trauma. We first note that physical pain should not be the end of a court's inquiry, but rather mental pain should be considered as well. Here, while we find an absence of physical pain due to the search being visual in nature, we recognize that the search was probably a embarrassment to Appellee and thus consider his mental pain and its traumatic effects.

We reiterate that a strip search is one of the most invasive and traumatic searches conducted. However, the fact that Appellee was turned, facing away from the "open door" and that no one other than the two officers were in the line of sight leads to the conclusion that the embarrassment was minimized to some degree.[9] Again, we repeat that simply because an individual chooses to hide contraband in an intimate location and does so making it immediately apparent to police, he may not then complain that the officers searched his person in an inappropriate manner absent other aggravating circumstances.

---

[9] Had the officers simply closed the door completely, we would have been less concerned with the embarrassing nature of this search.

Our consideration of trauma and mental pain is also affected by the fact that the officers did not come into physical contact with Appellee's genitals or buttocks. As noted by the Court of Appeals, even after seeing the drugs dangling from Appellee's genital area, the officers demonstrated restraint and common decency by removing the contraband without making physical contact with Appellee's anatomy. And while we understand that a visual examination is certainly uncomfortable, we posit that physical contact would have been even more upsetting. Thus, we find that the visual inspection, while inherently traumatic, involved minimal trauma and pain to Appellee.

### iii. Knowledge Required to Perform the Search

Finally, we turn to the knowledge required to perform this type of search, and conclude that, unlike the medical procedure addressed in *Schmerber*, a visual strip search of an arrestee does not necessitate specialized training. We believe the only knowledge required to conduct a strip search is supplied by common sense and decency as demonstrated by the officers here when they performed the search within four walls and by excluding everyone but the officers involved.

Here, the officers did not disrobe Appellee for public viewing and neither did they conduct the search outside in an open field. And although there is testimony that the door was partially opened, the officer testified that no one else was in the line of sight. The knowledge to do the strip search in private was exhibited by the officers in this case. Thus, we find that the officers

20

possessed an adequate know-how to perform this type of search.

After considering the factors evaluated in *Schmerber*, we conclude that the search was conducted in an appropriate manner.

### c. The Justification for Initiating the Search

Having found that the search was supported by probable cause, we find adequate justification for this search. It goes without saying that had the officer not been made immediately aware of the contraband by the plain feel of his hand during a *Terry* pat down, and continued to conduct a strip search of Appellee in the field, such conduct would shock the conscience of this Court and would not be tolerated. But we do not have that here.

Here, the search was performed after the officers: recognized that Appellee might be subject to a bench warrant; witnessed him conceal something near his groin; faced a potentially dangerous, ongoing fracas; heard an individual scream "It's in his crotch!"; knew that he sometimes carried a weapon; and became immediately aware that Appellee was harboring drugs on his person. We find that because of the need for officer and public safety and the need to preserve evidence, there existed ample justification to conduct this search.

### d. The Place in Which it is Conducted

Finally, we turn to the last *Bell* factor and consider the location in which the police conducted the search. Of all the factors considered thus far, we find this factor most troubling, yet ultimately conclude that it was reasonable under

the circumstances. *See Polk v. Montgomery Co,* 782 F.2d 1196, 1201-02 (4th Cir.1986) (whether the strip search was conducted in private is especially relevant in determining whether a strip search is reasonable under the circumstances). We recognize that strip searches are necessary for a plethora of reasons, and we understand that in order to preserve the safety of officers, of the public and of evidence, they must sometimes be employed. But we also take this opportunity, as did the United States Supreme Court, to issue a caveat: these interests "hardly justify disrobing an arrestee on the street." *Illinois v. Lafayette,* 462 U.S. 640, 645 (1983). Indeed some courts have suppressed evidence where police officers, in an attempt to recover evidence, have exposed an arrestee's most private anatomy to the public. However, most of those cases involved searches conducted outside of four walls. *See Amaechia v. West,* 237 F.3d 356, 361-62 (4th Cir. 2001) (holding a visual strip and visual cavity search unreasonable when done beside a police car); *Hill v. Bogans,* 735 F.2d 391, 394 (10th Cir. 1984) (finding unconstitutional "routine strip searches in a public area of persons detained for minor traffic offenses"); *United States v. Ford,* 232 F. Supp. 2d 625 (E.D. Va. 2002) (holding search unreasonable when conducted on the highway in broad day light). We do not have that here.

Here, while it is true that Appellee was strip searched in a room with a partially opened door it is also true that no one was in the line of sight during the search and that only the officers were in the room. And while the Court of Appeals was concerned with the possibility that someone might be able to peer

into the room where the search was taking place, the evidence is to the contrary.[10] We refuse to suppress evidence based upon the unsupported assertion that the search was conducted in a manner potentially exposing Appellate to prospective onlookers. Where a search is conducted unnecessarily exposing an arrestee's naked body to the public, we will suppress absent the most extraordinary and bizarre circumstances—but conjecture without evidence will not be considered.

Ultimately, because Appellee was strip searched within four walls and because he was not exposed to anyone not involved with the search, we conclude that the place in which the search was conducted was reasonable.

Therefore, after considering the *Bell* factors, we conclude that the need for the search outweighed the privacy considerations in this case.

### III. Conclusion

For the foregoing reasons, the Court of Appeals is reversed and the Fayette Circuit Court's order denying Appellee's motion to suppress is reinstated.

All sitting. All concur.

---

[10] Appellee did not testify at trial, only officer Schwartz who swore that no one was in "line of sight."

COUNSEL FOR APPELLANT:

Jack Conway
Attorney General of Kentucky

Gregory C. Fuchs
Assistant Attorney General
Office of Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, KY 40601-8204


COUNSEL FOR APPELLEE:

Linda Roberts Horsman
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane
Suite 302
Frankfort, KY 40601